UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| STACEY POSTMA, ) | CASE NO. 1:11CV1703 |
| ) | |
| Plaintiff, ) | JUDGE PATRICIA A. GAUGHAN |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| MICHAEL J. ASTRUE, ) | **Report and Recommendation** |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Stacey Postma ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI") and Disability Income Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the decision of the Commissioner be affirmed.

**I**.    **PROCEDURAL AND FACTUAL HISTORY**

Plaintiff filed an application for SSI on July 21, 2009 and an application for DIB on July 6, 2009, alleging disability beginning April 1, 2005. ECF Dkt. #9 at 169-172.[1] Plaintiff met the insured status requirements through December 31. 2013. *Id.* at 65. The SSA denied Plaintiff's application initially and on reconsideration. *Id.* at. 117-120. Plaintiff filed a request for an administrative hearing. *Id.* at 141-142. On May 18, 2010, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel. *Id.* at 77-106. At the hearing, the ALJ accepted the testimony of Plaintiff and Ted S. Macy, a vocational expert ("VE"). *Id*. On June 18, 2010, the

---

[1] Page numbers refer to "Page ID" numbers in the electronic filing system.

ALJ issued a Decision denying benefits. *Id.* at 63-76. Plaintiff filed a request for review, which the Appeals Council denied. *Id.* at 51-55.

On August 15, 2011, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1.  On April 6, 2012, Plaintiff filed a brief on the merits.  ECF Dkt. #14.  On May 15, 2012, Defendant filed a brief on the merits.  ECF Dkt. #17.  With leave of Court, Plaintiff filed a reply brief on June 11, 2012.  ECF Dkt. #21.

**II**.     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from chronic pain syndrome, depression, post traumatic stress syndrome ("PTSS"), and opioid dependence, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c). ECF Dkt. #9 at 65. The ALJ further determined that Plaintiff suffered from Wolfe-Parkinson-White syndrome, which constituted a non-severe impairment. The ALJ then concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1(20 C.F.R. 404.1520(d), 404.1525, and 404.1526, 416.920(d), 416.925 and 416.926). *Id*. at 65.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, meaning she can lift and carry twenty pounds occasionally and ten pounds frequently, she can stand, walk, and sit for six hours in an eight hour workday as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except she can occasionally climb stairs and ramps, bend, balance, stoop kneel, and crawl.  She can reach in all directions, handle, finger, and feel.  She cannot be exposed to extreme temperatures, vibrations, or hazardous working conditions.  She can perform simple, routine tasks with simple, short instructions and work related decisions with few workplace changes.  She cannot perform work requiring production rate pace.  She can have minimal contact with the public, but she can interact with coworkers and supervisors.  *Id.* at 67.  The ALJ further found that, although Plaintiff was unable to perform past relevant work, there exist jobs in significant numbers in the national economy that Plaintiff can perform, including bench assembler, wire worker, and final assembler. *Id.* at 70.  Accordingly, the ALJ determined that Plaintiff had not been under a disability as defined in the SSA and was therefore not entitled to benefits. *Id.* at 71.

III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

To be eligible for benefits, a claimant must be under a "disability" as defined by the Social Security Act. 42 U.S.C. §§ 423(a) & (d), 1382c(a). Narrowed to its statutory meaning, a "disability" includes physical and/or mental impairments that are both "medically determinable" and severe enough to prevent a claimant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *Id.* The claimant bears the ultimate burden of establishing that he or she is disabled under the Social Security Act's definition. *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir.1997).

Administrative regulations require a five-step sequential evaluation for disability determinations. 20 C.F.R. §§ 404.1520(a) (4), 416.920(a)(4):

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## V.    ANALYSIS

Plaintiff asserts three arguments in this appeal. First, she contends that the ALJ erred at step three when she concluded that Plaintiff's physical and mental impairments did not meet or equal the Listings. Second, Plaintiff argues that the ALJ did not properly consider Plaintiff's June 2009 treatment for depression and PTSS at the Brook Hospital. Finally, Plaintiff contends that the ALJ did not properly assess her credibility.

At the hearing, Plaintiff testified that she was born in October of 1978 and is married with a three-year-old daughter. ECF Dkt. #9 at 80-81. In 2006, Plaintiff's son, who was five month old, died as a result of Sudden Infant Death Syndrome. *Id.* at 89. She attributes her mental problems to the loss of her infant son. Plaintiff attributes her back pain to the epidural anethesia that she received during the births of her two children, which she believes were negligently administered. *Id.* at 101. At least one physician opined that Plaintiff's pregnancies, which occurred less than a year apart, could be the cause of her lower back pain. *Id.* at 552.

Plaintiff cares for her daughter on a daily basis, she prepares meals and does dishes, vacuums and dusts, and occasionally drives a car. *Id.* at 81-85. Her husband grocery shops and helps her with the laundry. *Id.* Although she is capable of performing personal hygiene and grooming tasks, at least two days a week she will not shower or bathe because she does not feel like doing anything. *Id.* at 83-84. She has no hobbies and rarely leaves the house, although her brother and sister-in-law live next door and visit her frequently.

Plaintiff testified that she suffers mild panic attacks[2] every day, and severe panic attacks[3] at least twice a week, despite taking Klonopin, Vistaril, and Geodon to treat her anxiety. *Id.* at 89-91. She also takes Ambien for insomnia. *Id.* at 100. She struggles with thoughts of suicide. *Id.* at 101. Her back pain is treated with narcotic pain medication, which includes Percocet, and Zanaflex, and a muscle relaxer. *Id.* at 91, 102. She also receives cortisone shots and uses a TENS unit. *Id.* at 91. At the hearing, she testified that she was scheduled to have surgery the following month "to deaden all of the nerves that lead to [her] sciatic nerve." *Id.* at 91, and that her reliance on pain medication may diminish after the surgery. *Id.* at 102.

She conceded at the hearing that she is dependent upon her pain medication. *Id.* at 102. She contends that her medication causes drowsiness, confusion, and memory loss. *Id.* at 89-94. She further testified that she has difficulty with her fine motor skills due to hand tremors. *Id.* at 95-97.

Plaintiff was evaluated for back pain at Norton Hospital's emergency room on April 16, 2009. *Id.* at 269. An MRI of her lumbar spine revealed multiple lumbar and sacral vertebral body hemangiomas that were stable compared to studies done over the previous three years. *Id.* There were no lumbar disc herniations, stenosis, or neural compression. *Id.* A day later she was admitted to Norton Hospital for "relentless and uncontrollable" back pain, as well as severe radiculopathy in her left leg that radiated down her leg. *Id.* at 254. She reported some numbness and urinary incontinence. An MRI of her thoracic spine showed no acute abnormality, but minor degenerative

---

[2]Plaintiff described a mild panic attack as "just basically a feeling of something's going wrong." ECF Dkt. #9 at 90.

[3]Plaintiff described a severe panic attack as "feeling impending doom." ECF Dkt. #9 at 90. She cannot breathe, gets chest pains, and vomits. *Id.*

-5-

changes of the mid and lower thoracic spine with small posterior mid line disc protrusion at T6-T7. *Id.* at 257-258. She was hospitalized from April 18, 2009 to April 21, 2009, and discharged with diagnoses of low back pain, chronic pain syndrome, and anxiety disorder. *Id.* at 203.

Plaintiff had a pain management consultation with Dean S. Collis, M.D. on May 6, 2009. *Id.* at 370-373. Plaintiff stated that her pain was six on a scale of one to ten. Dr. Collis observed "slightly exaggerated behavior" on Plaintiff's part and expressed concern about prescribing pain medication for someone with "an essentially negative MRI scan except for hemangioma." *Id.* at 371. He also expressed concern that Plaintiff conceded that she had ben accused of "doctor shopping" by previous physicians. *Id.* He diagnosed lumbago and myofascial pain, and referred Plaintiff for a EMG/NCS, but did not prescribe any pain medication. *Id.*

In an addendum to the May 6, 2009 medical notes, Dr. Collis writes that Plaintiff claimed that she was told by another patient in the waiting room that Dr. Collis was going to send her to a "quack" for the EMG. She told Dr. Collis that she did not like him very much and preferred to see his brother, who was his colleague in the practice. Dr. Collis attributed Plaintiff's outburst to the fact that he informed her that she was taking too much pain medication considering her exam and MRI scans. *Id.* at 372. On June 22, 2009, Plaintiff visited the emergency room for back pain, however, x-rays of her lumbar spine and sacrum were normal. *Id.* at 378-379.

On June 15, 2009, Plaintiff was voluntarily admitted to the Brook Hospital for treatment for depression and PTSS. *Id.* at 274. She reported that she had been depressed since the death of her son, and experienced decreased sleep and appetite, decrease energy and concentration, and feelings of guilt, hopelessness, and worthlessness. She indicated that her husband had lost his job with Ford Motor Company, and obtained a new job that paid substantially less, she lost her job as a nurse, they were filing for bankruptcy, and two of their cars had been repossessed. She had suicidal thoughts and was assigned a GAF score of 25. *Id.* at 281. During her hospitalization, Plaintiff was angry and confrontational without provocation. *Id.* at 276. She was discharged on June 22, 2009 with diagnoses of major depressive disorder, PTSS, opioid dependence, and borderline personality disorder and a GAF score of 58. *Id.* at 227.

She began outpatient treatment at the Brook Hospital, which included group therapy sessions, on June 25, 2009. *Id.* at 347. Although she initially participated, her behavior became progressively more withdrawn over the course of the next few sessions. *Id.* at 348. Plaintiff fell asleep at three sessions, which was attributed to over-medication. *Id.* at 349-351. Plaintiff struggled with anxiety and guilt as a result of her son's death. She expressed anger at her mother-in-law (Plaintiff's son was sleeping at her home on the night that he died) and resentment toward her then two-and-a-half year old daughter. *Id.* at 350-351. On July 7, 2009, medical records indicate that Plaintiff presented to the group in an "increasingly clear mood," which Plaintiff attributed to "detoxing from all meds." *Id.* at 353. On July 8, 2009, Plaintiff reported a low anxious mood, and the medical report indicates that she appeared over-medicated. *Id.* She slept through most of the session and appeared "to be unaware of what she was doing." *Id.* at 353-354.

Plaintiff stopped attending group therapy sessions on July 9, 2009. First, she claimed that she had scheduling problems, and then stated that her insurance did not cover the sessions and she could not afford to pay for them.

On October 21, 2009, state agency psychological consultant Mary Thompson, Ph.D. completed a Psychiatric Review Technique Form and mental residual functional capacity assessment. She concluded that Plaintiff had mild limitations in activities of daily living, and moderate limitations in maintaining social functioning and concentration, persistence, and pace, and no episodes of decompensation that were of extended duration. *Id.* at 440.

Plaintiff testified at the hearing that she began experiencing hallucinations in November of 2009. *Id.* at 100. During that month, she discovered that her husband was cheating on her and she instituted divorce proceedings. *Id.* at 101. On November 15, 2009, Plaintiff was admitted to EMH Regional Medical Center ("EMH") due to a prescription overdose. *Id.* at 555. She began psychiatric treatment at the Nord Center on November 20, 2009. *Id.* at 571. In an assessment conducted by the Nord Center, Plaintiff indicated that she had returned home to Elyria, Ohio approximately one week prior to the overdose because she and her husband had separated. *Id.* at 606. She was assigned a GAF score of 51 when she began her treatment at Nord Center. *Id.* at 580.

She was admitted to EMH on November 21, 2009 after she overdosed a second time on her medication. *Id.* at 555.

On December 2, 2009, state agency psychological consultant Dan Vandivier, M.D. completed a Psychiatric Review Technique Form and mental residual functional capacity assessment ,and reached the same conclusions as Dr. Thompson. *Id.* at 513. On December 7, 2009, a state agency medical consultant, Robert Brown, M.D., completed a physical residual functional capacity assessment, in which he concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, and could sit and stand/walk for six hours in an eight-hour workday. *Id.* at 523. Dr. Brown further concluded that Plaintiff could only occasionally climb ladders, ropes, and scaffolds but had no other postural limitations. *Id.* at 524. Dr. Brown further concluded that Plaintiff should avoid concentrated exposure to extreme temperatures and could not have even moderate exposure to vibrations and hazards. *Id.* at 525. In a psychiatric evaluation conducted by Dilbaugh Saini, M.D. on December 21, 2009, Plaintiff was given a GAF score of 60 to 65. *Id.* at 587. Dr. Saini recommended that Plaintiff wean off Klonopin, however Dr. Saini indicated that Plaintiff had no interest in reducing the amount of medication she was taking. *Id.*

Turning to Plaintiff's first argument, she contends that, although the ALJ undertook the appropriate step three analysis with respect to her depression, the ALJ failed to do so with respect to her PTSS and her chronic pain syndrome, both separately as well as collectively. At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4) (iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir.2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, a claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3). A claimant must satisfy all of the criteria to "meet"

the listing. *Id.*; *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir.2009). However, a claimant is also disabled if his or her impairment is the medical equivalent of a listing, 20 C.F.R. §404.1520(a)(4)(iii); *Turner*, 381 Fed. Appx. at 488, which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a). Medical equivalence can be found in three ways: (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is "at least of equal medical significance" to a listing impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality. 20 C.F.R. § 404.1526.

An ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *Lawson v. Comm'r of Soc. Sec.*, 192 Fed. Appx. 521, at *7 (6th Cir.2006) (upholding ALJ who "compar[ed] the medical evidence of Lawson's impairments with the requirements for listed impairments contained in the SSA regulations"). In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision. See *Marok v. Astrue*, 2010 WL 2294056, *3 (N.D.Ohio Jun.3, 2010).

Here, the ALJ found physical and mental impairments at step two: chronic pain syndrome, depression, PTSS, and opioid dependence. At step three, the ALJ found that "[Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04 [Affective disorders]." ECF Dkt. #9 at 66. Plaintiff argues, "The ALJ [ ] analyzed why [Plaintiff's] *depression* did not meet or equal a listed impairment specifically 12.04, which addresses depression. However, the ALJ made no determination whatsoever regarding whether the post-traumatic stress disorder or the chronic pain syndrome, which were found to be severe, met or equaled a listing. The ALJ also failed to assess whether all of [Plaintiff's] mental and physical impairments *combined* to meet or equal a listed impairment at step three." ECF Dkt. #16 at 673.

Plaintiff likens the ALJ's analysis at step three in this case to the analysis by the ALJ in *Reynolds v. Commissioner of Social Security*, 424 Fed.Appx 411 (6th Cir. 2011). In that case, the Sixth Circuit found that the ALJ's Decision was insufficient and required remand:

> Here, the ALJ found both a physical and mental impairment at Step Two: "back pain" and "an adjustment disorder." He then went on to Step Three to determine whether Reynolds had an impairment or combination of impairments that met or medically equaled one of the listed impairments. He began with his conclusion: "Claimant does not have an impairment or combination of impairments which, alone or in combination, meet sections 1.00 or 12.00 of the Listings." He then conducted a thorough analysis of the "Affective Disorders" Listing, Subsection 12.04, 20 C.F.R. pt. 404, Subpt. P, App. 1, conducting a full-page assessment of Reynolds' mental impairment. He compared her medical history and testimony to the Listing, assessing her "activities in daily living," "social functioning," "concentration, persistence or pace," and "decompensation," which tracks the criteria in that section. Such an analysis and conclusion regarding Reynolds' mental impairment clearly meets the substantial evidence standard.
>
> However, once he completed his analysis under section 12.00, the ALJ simply went on to the next step in the 5—step analysis—determining residual functional capacity. No analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe "back pain" impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not.

*Id.* at *3. The Sixth Circuit found that the ALJ failed to analyze Reynolds' physical condition in relation to the listed impairments and had skipped a step of the required analysis. According to the Court, "the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* at *4.

Based upon the Sixth Circuit's decision in *Reynolds*, Plaintiff contends that "the case turns on legal issues, not factual issues." ECF Dkt. #16 at 666. She does not cite the listings that she contends that she meets or equals, arguing instead that the ALJ's failure to address any listing other than 12.04 constitutes reversible error. Defendant argues that there is no listing for chronic pain syndrome, and that the vast majority of physical listings require specific objective findings, which are not present in the record. Because Plaintiff's physical examinations and objective studies were largely unremarkable with no documented cause for her pain, Defendant asserts that the ALJ's articulation of the "B" criteria under 12.04 was sufficient to survive review.

Plaintiff relies on *May v. Astrue*, 2011 WL 3490186 for the proposition that "Defendant's *post hoc* rationale that the evidence of record did not establish that [Plaintiff's] physical impairments satisfied the listing" is insufficient to cure defects in the ALJ's analysis and that " the ALJ was required to evaluate [the] evidence, compare it to [the appropriate section of] the Listings, and give an explanation, in order to facilitate meaningful judicial review." ECF Dkt. #16 at 674. However, the magistrate judge in *May* further observed that "correction of such an error," based upon the medical record in that case, "is not merely a formalistic matter of procedure, for it is possible that the evidence May put forth could meet this listing." *May* at *9. In other words, in *May*, there was sufficient evidence in the record for the ALJ to conclude that the plaintiff in *May* could meet or equal a listing. The same is not true here.

Plaintiff contends that the ALJ failed to consider any listing for her pain. However, Plaintiff has not identified the listing that she contends that her impairments meet or equal. Furthermore, Defendant correctly argues there is no listing for chronic pain syndrome and that there is no objective evidence in the record to support her allegations of pain. Therefore, the undersigned recommends that remanding this matter for further review by the ALJ would constitute a "formalistic matter of procedure" with respect to Plaintiff' alleged pain, because even Plaintiff has not identified a listing that she arguably meets or equals.

Plaintiff also contends that the ALJ failed to consider her PTSS at step three. 12.06, captioned, "Anxiety Related Disorders," reads, in pertinent part:

> 12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A. Medically documented findings of at least one of the following:
>
> 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>
>> a. Motor tension; or
>>
>> b. Autonomic hyperactivity; or

>>c. Apprehensive expectation; or
>>
>>d. Vigilance and scanning;
>
>Or
>
>2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
>
>3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
>
>4. Recurrent obsessions or compulsions which are a source of marked distress; or
>
>5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
>
>And
>
>B. Resulting in at least two of the following:
>
>>1. Marked restriction of activities of daily living; or
>>
>>2. Marked difficulties in maintaining social functioning; or
>>
>>3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>
>>4. Repeated episodes of decompensation, each of extended duration.
>
>Or
>
>C. Resulting in complete inability to function independently outside the area of one's home.

There is sufficient evidence in the record to demonstrate that, although the ALJ did not specifically identify the listing at 12.06, he did consider the requirements of the listing. Although Plaintiff testified that she has severe panic attacks at least twice a week, which she characterized as a feeling of "impending doom," the ALJ concluded that she only experiences mild to moderate limitations as a result of her panic attacks. ECF Dkt. #9 at 66. Furthermore, the ALJ concluded that Plaintiff does not meet the "C" criteria in 12.06, that is, she specifically noted that Plaintiff attended group therapy sessions outside of her home and that she goes to church. *Id.* at 84. Accordingly, the undersigned recommends that Plaintiff's first argument does not have merit.

Next, Plaintiff argues that the ALJ did not give the proper weight to her treatment records from the Brook Hospital. Plaintiff contends that, despite medical records reflecting one week of

-12-

inpatient treatment and three weeks of outpatient treatment, the ALJ "never mentioned or discussed these important records or reflected on [Plaintiff's] mental health history." ECF Dkt. #16 at 675.

There is no requirement that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir.2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  Here, the ALJ analyzed the medical evidence from Plaintiff's hospitalization in November of 2009.  The ALJ essentially concluded that Plaintiff's GAF score showed improvement in a clinical setting where her medication could be controlled.  Although the ALJ reached this conclusion following a discussion of her hospitalization and treatment in November of 2009, the same conclusion can be drawn from her hospitalization in April of 2009.  Plaintiff's GAF score vastly improved over the course of her hospitalization in April of 2009.  Moreover, medical notes from her group sessions indicate that she was often drowsy and over-medicated, and that she became clear-headed when she "detoxed" from her medication as directed.  Accordingly, the undersigned recommends that the Court find that the ALJ properly considered the evidence in the record with respect to Plaintiff's treatment for her mental impairments.

Finally, Plaintiff contends that the ALJ did not properly assess her credibility.  When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40.  Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey v. Secretary of Health and Human Services*,

-13-

987 F.2d 1230, 1234 (6th Cir.1993). Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ's opinion is replete with references to comments by physicians and medical professionals involved in Plaintiff's treatment that accuse Plaintiff of exaggerated behavior, drug-seeking behavior, manipulation, and doctor shopping. Moreover, there are several recommendations by physicians in the record that Plaintiff should wean off a particular medication, and occasions where she is observed to be over-medicated, but the record demonstrates that Plaintiff rejected those recommendations and made no effort to reduce her dependence of her pain medication. Consequently, the ALJ's decision to discount Plaintiff's testimonial evidence is supported by the record.

For the foregoing reasons, the undersigned recommends that the decision of the Commissioner should be affirmed.

DATE: June 22, 2012

 */s/George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).